UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

LUKE FIZULICH,

                **Plaintiff,**

     -against-

DWAYNE KILLINGS (in his individual capacity only),
STATE UNIVERSITY OF NEW YORK AT ALBANY,
and MARK BENSON,

                **Defendants.**

------------------------------------------------------------------------X

Civil Action No.: 1:22-cv-1190 (DNH/DJS)

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Luke Fizulich ("Fizulich"), by and through his attorneys, Nesenoff & Miltenberg, LLP, respectfully brings suit against Dwayne Killings ("Defendant Killings"), State University of New York at Albany (hereinafter "SUNY Albany"), and Mark Benson ("Defendant Benson"), alleging the following:

**NATURE OF THE ACTION**

1. Fizulich was a Sophomore student and a member of Men's Basketball at SUNY Albany at the time of the assault[1] alleged herein. Men's Basketball at SUNY Albany is a Division I program.

2. His dream was to play college basketball and he worked his entire life to accomplish his dream, all to have it taken away on November 24, 2021, when Defendant Killings,

---

[1] The definition of assault as used in the introduction and facts portion of this Complaint refers to the Oxford Dictionary definition "a physical attack." Notably, the civil cause of action for assault in a pleading in the State of New York is defined differently than the dictionary definition, in that the tort of assault is defined as an "intentional placing of another person in fear of imminent harmful or offensive contact." *Charkhy v. Altman*, 252 A.D.2d 413, 414 (1st Dept. 1998). The civil cause of action for battery in the State of New York is defined as an "intentional wrongful physical contact with another person without consent." *Id.*

the Head Coach of Men's Basketball at SUNY Albany, violently and viciously grabbed him, threw him up against a locker and struck him in the face, drawing blood.

3. The violent assault, which occurred in a locker room in Kentucky during a road game against Eastern Illinois University, was witnessed by every SUNY Albany assistant coach and basketball player on the team. Notably, neither Defendant Killings, nor any of the other SUNY Albany assistant coaches who witnessed the assault, reported it to the administration.

4. Fizulich did not initially talk about the assault because he was humiliated, because of "locker room culture," and because of fear of losing a promised athletic scholarship offer for the next two years. The environment was such that it was not safe for him to raise this issue and did not allow him to come forward and report Defendant Killings without repercussion.

5. Fizulich could not avoid contact with Defendant Killings, being that he was the Head Coach, and each and every day he had to endure under his authority caused Fizulich to suffer further. The violent assault by Defendant Killings took such an emotional toll that towards the end of the season, Fizulich had a breakdown.

6. On the evening of February 26, 2022, Fizulich contacted his long-time trainer and former coach, who was like a mentor and father figure, and told him of the assault and his distress. Fizulich's former coach and mentor, hearing how distraught Fizulich was, immediately traveled for hours to offer Fizulich emotional support. He convinced Fizulich to tell his parents about the assault and to report the assault to SUNY Albany administration, to protect himself and the other players on the team. The assault was reported on February 27, 2022.

7. Defendant SUNY Albany conducted an investigation and found Defendant Killings responsible for the violent assault on Fizulich and for failing to timely report the assault. Upon information and belief, the finding resulted in a decision by Defendant SUNY Albany and

Defendant Benson, SUNY Albany's Athletic Director, to terminate Defendant Killings on March 27, 2022.

8. Defendant Killings immediately associated himself with a public relations firm ("PR firm"), on March 29, 2022, to assist in protesting his termination. The PR firm rallied up business and civil rights leaders who held a protest on March 30, 2022. The reported assault was also heavily publicized in the media and the sports arena, and Fizulich was "outed" by a SUNY Albany employee as the student complainant.

9. While the business and civil rights leaders admittedly did not know the facts underlying SUNY Albany's decision to terminate, they rallied behind Defendant Killings because it was their belief that Defendant Killings, as a Black male coach, was an important figure to the community, particularly young Black males. The business and civil rights leaders further demanded more transparency of the investigation.

10. Rather than discuss its decision, Defendant SUNY Albany and Defendant Benson, succumbing to the pressure of the protest, reversed the decision to terminate Defendant Killings on April 1, 2022. Defendant SUNY Albany and Defendant Benson did not discuss the decision to reverse Defendant Killings' termination with Fizulich, despite the decision being detrimental to his well-being.

11. Defendant SUNY Albany and Defendant Benson, instead of protecting Fizulich as the victim of the assault, showed preference to the assaulter because of his race. Notably, Fizulich is a white male.

12. The decision to reverse the termination breached SUNY Albany's Campus and Workplace Violence Prevention Policy and Program, of which Fizulich was entitled to rely upon.

13. Defendant SUNY Albany and Defendant Benson knew that Fizulich was unable to handle playing under the man who physically assaulted him but disregarded his well-being because of the pressure they received from business and civil rights leaders. Defendant SUNY Albany and Defendant Benson forced Fizulich to continue his collegiate and basketball career under conditions that were unbearable.

14. Fizulich was distraught over the mishandling of his complaint and the decision to reverse termination and actively sought transfer to another university with a basketball program through the transfer portal.

15. Although Fizulich was interviewed by several schools, he was advised by those schools that they did not want him because he was "messy," meaning that because his name was associated with the reported assault and publicized, no school would accept him on their basketball team.

16. It was also learned from individuals associated with the collegiate basketball community that Defendant Killings put a negative word out to other schools about Fizulich which caused him to be blacklisted.

17. It did not matter that Fizulich was the victim, and that Defendant Killings committed the vicious and violent act, no school would accept Fizulich into their basketball program.

18. All the years that Fizulich worked so hard to accomplish his dream of playing college basketball at a D1 level (or even a D2 or D3 level) are gone. The assault and the resulting harm by Defendants Killings, SUNY Albany and Benson have caused Fizulich to suffer from severe emotional distress, reputational harm, lost educational opportunities and lost occupational opportunities, which will continue to harm him for the rest of his life.

## THE PARTIES

19. Plaintiff Fizulich is a natural person, citizen of the United States, and a resident of the State of New Jersey. He matriculated at Marquette University in the Fall of 2020 and transferred to SUNY Albany as a Sophomore in the Fall of 2021.

20. During the events described herein, Fizulich was enrolled as a full-time student at SUNY Albany and was a member of the Men's Basketball team.

21. Defendant SUNY Albany is a principal campus of the State University of New York ("SUNY"), an Educational Corporation formed and existing under the Education Law of the State of New York. SUNY Albany's campus and principal place of business is located at 1400 Washington Avenue, Albany, New York, and within this Court's jurisdiction.

22. Defendant Dwayne Killings was and continues to be the Head Coach of the Men's Basketball program at SUNY Albany. While Defendant Killings is an employee of SUNY Albany, he is named in this suit only in his individual capacity. Upon information and belief, Defendant Killings is a resident of the State of New York, County of Albany.

23. Defendant Mark Benson was and continues to serve as the Athletic Director at SUNY Albany. Upon information and belief, Defendant Benson is a resident of the State of New York, County of Albany.

## JURISDICTION AND VENUE

24. The Court has federal question jurisdiction over Defendant SUNY Albany because the federal law claim arises under the United States Constitution and federal statutes.

25. This Court has personal jurisdiction over Defendant SUNY Albany on the ground that it is conducting business within the State of New York.

26. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over Defendant Killings and Defendant Benson because there is complete diversity of citizenship: Fizulich is a citizen of the State of New Jersey, the Defendants are citizens of the State of New York, and the matter in controversy exceeds $75,000.

27. This Court has personal jurisdiction over Defendant Killings and Defendant Benson because they are residents of the State of New York.

28. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because Defendants reside in this judicial district and a substantial part of the events which give rise to Fizulich's claims against Defendants took place in Albany, New York, which is located in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### I. Fizulich's background

29. Fizulich has loved basketball since he was a child and spent his entire life developing and improving his skills, with the goal of playing for a Division I level basketball team and a post-graduate career playing basketball in Europe.

30. Fizulich played well during his high school years and was heavily recruited to play for Division II and III teams.  He was also offered preferred walk-on spots by two Division I, Big East Conference teams, which Fizulich knew would not give him as much playing time as Division II and III teams but being on the roster of a Division I team opens many doors for future opportunities in basketball post-graduation, and it was Fizulich's goal to seek out those opportunities.

31. Fizulich chose to accept an offer for a preferred walk-on spot at Marquette because he wanted the opportunities to travel with "the big-time" players and play against Division I teams. Notably, less than one percent of all high school students become Division I basketball players.

32. Defendant Killings was an Assistant Coach of Men's Basketball at Marquette University during Fizulich's Freshman year.

33. Fizulich spent all of his Freshman year at Marquette University working out and practicing with the Big East Conference program. This gave Fizulich a lot of confidence, knowing that he could compete against these top-rated players. Because of his dedication and hustle, Fizulich had the opportunity to play in a season game for Marquette.

## II. Transfer to SUNY Albany

34. In March 2021, Marquette University Head Coach Wojciechowski was terminated and Defendant Killings, moved to SUNY Albany, where he became the Head Coach of the Division I Men's Basketball program.

35. Defendant Killings reached out to Fizulich to join the SUNY Albany Men's Basketball program as a walk-on, an offer that was quite appealing to Fizulich because although SUNY Albany was also a Division I team, it was not as grand of a program as Marquette, and he believed there was more of an opportunity to play and expose his skills as a player.

36. Upon a promise by Defendant Killings to Fizulich and his parents that he would be a featured player, Fizulich believed this to be a huge opportunity for him and agreed to transfer to SUNY Albany.

37. While Fizulich knew Defendant Killings since his senior year of high school, he did not know him as a Head Coach and had no reason to know of his violent propensities.

7

38. Fizulich did not play much in the first few games of the season, although he played well when he was in.

39. The team lost their first five games and Defendant Killings was flustered. A few days prior to the day of the assault, after the team lost to Eastern Kentucky and was 0-4 for the season, Defendant Killings became verbally abusive and cursed everyone out.

40. Fizulich took a charge during the game against Eastern Kentucky and needed three stitches to repair his lip.

### III. Assault by Defendant Killings

41. On the date of assault, the team was scheduled to play Eastern Illinois University, and Fizulich and his teammates were excited to play. They were in the locker room getting ready and after a team stretch, Defendant Killings walked hastily into the locker room, past the other players and coaches, grabbed Fizulich and without warning, threw him against a locker and violently and viciously struck him hard across his face. The contact was so hard that it drew blood and caused one of the stitches in his lip to burst open.

42. The assault was witnessed by all of the other coaches and team members, who were stunned.

43. Throughout the rest of the game, all of Fizulich's other coaches and teammates came over to check on Fizulich and see if he was ok. Fizulich remained angry and despondent for the remainder of the day.

44. Defendant Killings told the entire team in the locker room, sometime after he struck Fizulich, that the reason he did it was because he wanted Fizulich to play angry, and he wanted the whole team to play angry. Later, Defendant Killings told Fizulich that his "method" didn't work because the team did not play well that game.

45. The assault was not reported, and Fizulich tried to forget the assault and continue with the team.

46. Fizulich did not talk about the assault because he was humiliated, because of "locker room culture," and because of fear of losing a promised athletic scholarship for the next two years. He thought he was supposed to take that type of physical abuse and continued playing despite the fear of further physical harm at the hands of his assaulter. However, over the next few months, his anger turned into frustration, embarrassment, and an increasing fear that Defendant Killings would assault him again.

47. Defendant Killings' violent outbursts, uncontrollable temper and physical violence were intimidating, and Fizulich became more and more withdrawn as the season continued, until finally he could not take it anymore and called his former coach and mentor for help.

48. After telling his former coach about the assault, and the coach hearing how distraught Fizulich was, the coach drove for hours to personally console Fizulich and encourage him to tell his parents and report the assault to SUNY Albany's administration.

49. The next morning, on February 27, 2022, Fizulich reported the assault.

IV. **Investigation and termination by SUNY Albany**

50. The investigation into the assault started several days after it was reported. Fizulich advised during his initial meeting with administrators from SUNY Albany that he could no longer play under Defendant Killings under any circumstances.

51. SUNY Albany permitted Defendant Killings to continue coaching two games despite Fizulich's report of the assault. In fact, SUNY Albany waited for the season to be over before removing Defendant Killings from the team on March 9, 2022, pending investigation.

52. Fizulich was informed that Defendant Killings admitted the assault but stated that it was "an accident." However, interviews with assistant coaches and other students confirmed Fizulich's version of events, that this was a vicious assault and was no accident.

53. After completing its investigation, SUNY Albany found Defendant Killings responsible for assault and upon information and belief, Defendant SUNY Albany and Defendant Benson decided to terminate Defendant Killings on March 27, 2022.

## V. SUNY Albany reverses its decision because of racial pressure

54. On March 29, 2022, Defendant Killings became associated with a PR firm to fight termination.

55. Upon information and belief, the PR firm contacted the media and civil rights leaders to assist Defendant Killings. Fizulich was identified and exposed by the media the same day, as the student who reported the assault that led to SUNY Albany's decision to terminate Defendant Killings.

56. Business and civil rights leaders held a rally for Defendant Killings on March 30, 2022, to protest the termination of Defendant Killings, despite the admitted lack of knowledge as to the cause of the decision to terminate.

57. Defendant SUNY Albany and Defendant Benson succumbed to the pressure and on April 1, 2022, and reversed the decision to terminate because of racial tensions, without communicating with Fizulich, a white male, and without any care for his well-being. Defendant Killings was instead given a suspension of five games and a fine.

58. The decision by Defendants SUNY Albany and Benson to reverse the decision to terminate Defendant Killings was purely based on race. Defendant SUNY Albany and Defendant

Benson, instead of protecting Fizulich as the victim of the assault, showed preference to the assaulter because of his race.

59. In discussions with other coaches, it was learned that coaches in the profession know what happened to Fizulich and they are all shocked Defendant Killings still remains a Head Coach at SUNY Albany.

## VI. Defendants SUNY Albany and Benson Violate Policy

60. Defendant SUNY Albany promises its students certain community standards to promote a safe environment. These standards include policies and procedures in place to discipline clearly prohibited conduct.

61. Among the policies in place to protect students at SUNY Albany is the Campus and Workplace Violence Prevention Policy and Program ("Violence Prevention Policy"). The Violence Prevention Policy provides in section A, SUNY Albany's commitment to zero tolerance for violence.

62. Prohibited conduct under the Violence Prevention Policy, includes: (B.1.) the use of force with intent to cause harm, including physical attacks, any unwanted contact such as hitting, fighting, pushing or throwing objects; and (B.3.) Acts or threats which are intended to intimidate, harass, threaten, bully, coerce, or cause fear of harm whether directly or indirectly.

63. Each department chairperson, director, administrator, or supervisor is responsible for implementing SUNY Albany's Violence Prevention Policy.

64. Upon information and belief, Defendant SUNY Albany and Defendant Benson, after an investigation confirmed the assault by Defendant Killings, decided to terminate Defendant Killings, in conformity with SUNY Albany's zero tolerance Violence Prevention Policy.

65. A few days later, Defendant SUNY Albany and Defendant Benson, succumbing to the pressure of community and civil rights leaders, reversed course, in violation of the SUNY Albany's Violence Prevention Policy, and allowed Defendant Killings to continue to serve as Head Coach of Men's Basketball after a five-game suspension. There were no measures in place to prevent further assaults or harm to Fizulich.

66. The reversal of the decision to terminate was racially motivated and placed Fizulich, the victim of the assault and a member of Men's Basketball, at great risk of harm.

**VII. Aftermath**

67. Fizulich placed his name in the basketball transfer portal, which is used by college basketball players to give notice to other schools of their availability and allows coaches at other schools to pursue the college athlete requesting a transfer.

68. Several schools reached out to Fizulich and interviewed him but would not accept him because of the media attention that the assault received. It was further learned that Defendant Killings spread lies and half-truths to other schools about Fizulich, causing him to be blacklisted.

69. Fizulich has been unsuccessful in his endeavor to find another school with a basketball program that would allow him onto their team. As a result, his dreams of playing basketball in college and pursuing a career in basketball in Europe are shattered, all stemming from the violent and vicious assault by Defendant Killings, and Defendants SUNY Albany's and Benson's deliberate indifference to Fizulich because of his race.

70. Fizulich has been trying to deal with the emotional toll of the vicious assault, Defendant SUNY Albany's and Defendant Benson's deliberate indifference, and the lost opportunity to play a sport he loves. He has had to undergo treatment to deal with his distress and depression resulting from the harm caused by the Defendants.

71. As a result of the assault by Defendant Killings, and Defendant SUNY Albany's and Defendant Benson's discriminatory practices and breach of policy, Fizulich has suffered and will continue to suffer severe financial distress, emotional distress, anxiety and depression.

72. Fizulich has been deprived of his education and participation in basketball due to the Defendants' conduct and actions and will experience severe reputational damages for years to come.

## COUNT I
### Assault and Battery
### (Defendant Killings)

73. Fizulich repeats and realleges each and every allegation contained in paragraphs "1" through "72" as if fully set forth herein.

74. On November 24, 2022, Defendant Killings viciously grabbed Fizulich, threw him against a locker and struck him with force across his face, drawing blood.

75. Defendant Killings caused harm to Fizulich through the violent and unlawful contact, without provocation and/or consent.

76. Defendant Killings further placed Fizulich in fear of imminent harm moments before the vicious and violent assault.

77. Fizulich has since suffered severe emotional damages and the loss of educational and occupational opportunities.

78. As a direct and proximate result of Defendant Killings' conduct, Fizulich sustained and will continue to suffer tremendous damages including, without limitation, severe emotional damages, reputational harm, and the loss of educational and occupational opportunities.

79. As a result of the foregoing, Fizulich is entitled to compensatory and punitive damages, in an amount to be determined at trial.

## COUNT II
### Tortious Interference with Contract
### (Defendant Killings)

80. Fizulich repeats and realleges each and every allegation contained in paragraphs "1" through "79" as if fully set forth herein.

81. New York law recognizes the existence of an implied contractual relationship between a State University and students involved in its academic and sports programs, the terms of which are contained in the university's bulletins, circulars, and regulations. *Doe v. Syracuse*, 2022 WL 798058 *6 (N.D.N.Y. March 16, 2022).

82. Implicit in its contractual relationship and expressly provided by SUNY Albany's policies, Fizulich was promised a safe environment in his continued education and participation in SUNY Albany's Men's Basketball program.

83. Fizulich further signed a commitment agreement to participate in SUNY Albany's Men's Basketball program.

84. At all relevant times, Defendant Killings had knowledge of Fizulich's contractual relationship with the University and knew Fizulich was a student enrolled at the University and a member of SUNY Albany's Basketball program.

85. Defendant Killings acted outside the scope of his employment when he intentionally, and without provocation or consent, assaulted Fizulich during a school event.

86. Defendant Killings' intentional acts interfered with, disrupted and/or prevented Fizulich from continuing his studies at SUNY Albany and from continuing his participation in the Men's Basketball program.

87. Defendant Killings' intentional acts interfered, disrupted and/or prevented Fizulich from continuing his participation in the SUNY Albany Men's Basketball program, and halted his

ability from transfer to another Basketball program or to ever reach his potential to play for a European team.

88. As a direct and proximate result of the intentional interference with his contractual relationships, Fizulich has suffered significant compensatory damages in excess of the statutory threshold.

89. As a further direct and proximate result of Defendant Killings' intentional interference with Fizulich's contractual and prospective contractual relationships, Fizulich has been required to retain the services of an attorney to prosecute this action and has been damaged thereby. Fizulich is therefore entitled to an award of reasonable attorney's fees and costs.

## COUNT III
### Title VI of the Civil Rights Act
### (SUNY Albany)

90. Fizulich repeats and realleges each and every allegation contained in paragraphs "1" through "89" as if fully set forth herein.

91. Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

92. Defendant SUNY Albany receives federal funds and is therefore subject to the requirements of Title VI.

93. Defendant SUNY Albany is not immune from suit because Congress abrogated sovereign immunity for violations of Title VI.  See, 42 U.S.C. §2000d-7(b).

94. Private individuals may sue to enforce Title VI and obtain damages. See, *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001); *Bibliotechnical Athenaeum v. American University of Beirut*, 527 F.Supp.3d 625 (S.D.N.Y. 2021).

95. A Title VI claim requires that a plaintiff show that "(1) the defendant discriminated on prohibited basis; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's action." *Bibliotechnical Athenaeum*, 527 F.Supp.3d at 632, *citing to*, *HB v. Monroe Woodbury Cent. School Dist.*, 2012 WL 4477552, at *14 (S.D.N.Y. Sept. 27, 2012) (*quoting Faccio v. Eggleston*, 2011 WL 3666588, at *9 (N.D.N.Y. Aug. 22, 2011).

96. Here, the facts clearly and unequivocally establish that Defendant SUNY Albany discriminated against Fizulich, a white student, and a victim of a vicious assault perpetrated by Defendant Killings, a black coach, when it chose to reverse its decision to terminate Defendant Killings because of pressure from civil rights leaders in the community, thereby ignoring Fizulich's complaint and well-being because of his race.

97. By reversing the decision to terminate Defendant Killings, Fizulich was forced to play under conditions that were unbearable, effectively excluding him from participation in his beloved sport and denying him the benefits that brought him to SUNY Albany in the first place.

98. Defendant SUNY Albany's actions, intentionally showing preference to one racial group over another, is a violation of Title VI.

99. Fizulich, having no other rational choice but to leave SUNY Albany, has been unable to transfer to another men's basketball program, in part due to Defendant SUNY Albany's reversal of its decision to terminate Defendant Killings on racial grounds.

100. As a result of Defendant SUNY Albany's discriminatory practices, Fizulich sustained and will continue to suffer tremendous damages including, without limitation, loss of future educational and career opportunities, reputational damage, and severe financial distress, emotional distress, anxiety, and depression.

101. As a result of the foregoing, Fizulich is entitled to compensatory and punitive damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV
### Breach of Contract
### (Defendant Benson)

102. Fizulich repeats and realleges each and every allegation contained in paragraphs "1" through "101" as if fully set forth herein.

103. An express and/or implied contract was created when Fizulich accepted an offer of admission to SUNY Albany and paid the tuition and fees. Rights and obligations contained in SUNY Albany's policies become part of the contract.

104. SUNY Albany promised its students, including Fizulich, an environment that is free of violence and a zero-tolerance policy to handle acts of violence.

105. Defendant Benson, as the Athletic Director and supervisory authority over Men's Basketball, was required to uphold SUNY Albany's zero tolerance Violence Prevention Policy.

106. Upon information and belief, after the assault by Defendant Killings was confirmed through SUNY Albany's investigation, Defendant Benson authorized Defendant Killings' termination.

107. Upon information and belief, Defendant Benson succumbing to the pressure to reverse termination because of Defendant Killings' race, reversed his decision to terminate

Defendant Killings and allowed him to continue to serve as the Head Coach of Men's Basketball after a five-game suspension.

108. The reversal of termination violated SUNY Albany's zero tolerance Violence Prevention Policy, and directly harmed Fizulich by allowing Defendant Killings to maintain unfettered authority over Fizulich, as a player on SUNY Albany's Men's Basketball team. The violation of SUNY Albany's Violence Prevention Policy breached the contract between SUNY Albany and Fizulich.

109. By reversing the termination, Defendant Benson created an unsafe environment for Fizulich and contributed to the damages in this case.

110. Fizulich is therefore entitled to recover damages for the breach of express and/or implied contractual obligations described above, in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Fizulich demands judgment from all Defendants in the form of compensatory and punitive damages to be determined at trial, including, without limitation, damages to emotional and psychological well-being, damages to reputation, loss of educational and athletic opportunities, future economic losses, and loss of future career prospects.

Fizulich further seeks prejudgment interest, attorneys' fees, expenses, costs and disbursements against Defendant SUNY Albany for violations of Title VI, and all other just and appropriate relief.

**JURY DEMAND**

Fizulich herein demands a trial by jury of all triable issues in the present matter.

**Dated: New York, New York**
**November 14, 2022**

                            **Respectfully Submitted,**
                            **NESENOFF & MILTENBERG, LLP**

                  By:   *Stuart Bernstein*
                            Stuart Bernstein, Esq.
                            Janine L. Peress, Esq. *(Adm. Pending)*
                            363 Seventh Avenue, Fifth Floor
                            New York, New York 10001
                            (212) 736-4500
                            *Attorneys for Plaintiff*

To:

Dwayne Killings
c/o SUNY Albany
1400 Washington Avenue
Albany, New York 12222

State University of New York at Albany
1400 Washington Avenue
Albany, New York 12222

Mark Benson
c/o SUNY Albany
1400 Washington Avenue
Albany, New York 12222