UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

LUKE FIZULICH,

                             *Plaintiff,*

   -against-

DWAYNE KILLINGS (in his individual capacity only),
and STATE UNIVERSITY OF NEW YORK AT
ALBANY,

                            *Defendants.*

Case No.: 1:22-cv-01190 (DNH/DJS)

---

# PLAINTIFF LUKE FIZULICH'S BRIEF IN OPPOSITION TO DEFENDANT KILLINGS' MOTION FOR SUMMARY JUDGMENT

**NESENOFF & MILTENBERG, LLP**
**363 Seventh Ave, Fifth Floor**
**New York, New York 10001**
**Tel: (212) 736-4500**

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1
STATEMENT OF FACTS ....................................................................................................... 1
LEGAL STANDARD ............................................................................................................... 3
ARGUMENT ............................................................................................................................ 4

    I.    THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S ASSAULT AND BATTERY CLAIMS ............ 4

        A.    The Plaintiff Does Not Dispute that New York law Applies. ........................................ 5
        B.    New York Assault and Battery. .................................................................................. 5

    II.    PLAINTIFF HAS RAISED GENUINE ISSUES OF MATERIAL FACT ON HIS TORTIOUS INTERFERENCE WITH CONTRACT CLAIM .................................................... 7

        A.    Whether a Contract Exists Between Plaintiff and Albany is a Question of Fact for a Jury to Decide. .................................................................................................................... 8
        B.    Killings Had Actual or Constructive Knowledge of the Contract Between Plaintiff and Albany. ............................................................................................................................ 9
        C.    There is a Question of Fact as to Whether Killings' Wrongful Conduct Induced a Breach of Albany's Contract with Plaintiff. ............................................................................ 10

    III.    PLAINTIFF HAS SATISFIED THE AMOUNT IN CONTROVERSY REQUIREMENT ................................................................................................................... 12

CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ............................................................................................................. 4

*Bogoni v. Friedlander*,
   197 A.D.2d 281 (1st Dep't 1994) ........................................................................................ 11

*Brown v. Samalin & Bock, P.C.*,
   168 A.D.2d 531, 563 N.Y.S.2d 426 (1990) ........................................................................ 13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................................. 4

*Cerilli v. Kezis*,
   16 A.D.3d 363 (2d Dep't 2005) ............................................................................................ 6

*Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*,
   93 F.3d 1064 (2d Cir. 1996) ............................................................................................... 12

*Clogher v. New York Med. Coll.*,
   112 A.D.3d 574 (2013) ......................................................................................................... 9

*Compare Holtz c. Wildenstein & Co.*,
   261 A.D.2d 336 (1st Dep't 1999) ......................................................................................... 5

*Crouch v. Atlas Van Lines, Inc.*,
   834 F. Supp. 596 (N.D.N.Y. 1993) ............................................................................... 13, 14

*Diamond v. Sokol*,
   468 F. Supp. 2d 626 (S.D.N.Y. 2006),
   *on reconsideration*, No. 05 CIV. 4993 (GEL), 2007 WL 9815944 (S.D.N.Y. May 18, 2007) . 13

*Goff v. Clarke*, 302 A.D.2d 725
   (3d Dep't 2003) .................................................................................................................... 6

*Lama Holding Company v. Smith Barney Inc.*,
   88 N.Y. 2d 413 (1996) ......................................................................................................... 7

*Lujan v. Sensio Co. (US) Inc.*,
   No. 24-CV-3479 (LJL), 2025 WL 834835 (S.D.N.Y. Mar. 14, 2025) .......................... 12, 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................................................. 4

*New Windsor Volunteer Ambulance Corps v. Meyers*,
   442 F.3d 101 (2d Cir. 2006) ................................................................................................. 8

*Portus Singapore PTE LTD v. Kenyon & Kenyon LLP*,
   449 F. Supp. 3d 402 (S.D.N.Y. 2020) ................................................................................ 13

*Repetti v. Jacques*,
   No. 160267-2020, 2023 WL 2784459 (N.Y. Sup. Ct. Apr. 04, 2023) .................................. 6

*Rynasko v. New York Univ.*,
   63 F.4th 186 (2d Cir. 2023) ............................................................................................ 8, 10

*Tardif v. City of New York*,
  991 F.3d 394 (2d Cir. 2021) ............................................................................................ 5
*Tenenbaum v. Williams*,
  193 F.3d 581 (2d Cir. 1999) ............................................................................................ 3
*Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*,
  499 F. Supp. 2d 233 (E.D.N.Y. 2007) ............................................................................. 7

**Statutes**

28 U.S.C.A. § 1332 ............................................................................................................ 12

**Other Authorities**

Fed. R. Civ. P. 56 ..................................................................................................... 1, 3, 7

**PRELIMINARY STATEMENT**

Plaintiff Luke Fizulich ("Fizulich" or "Plaintiff") submits this brief in opposition to Defendant Dwayne Killings ("Killings"), motion for summary judgment pursuant to F.R.C.P. 56. Fizulich, a former student and member of the Men's Basketball team at the State University of New York Albany ("Albany" or the "University"), brought this suit to recover damages caused by an assault committed by Head Coach Killings before a game.

The Court should deny Killings' motion for summary judgment because there are genuine disputes as to material facts that must be resolved by a jury. First, the evidence does not show that Killings' contact with Fizulich was unintentional. Second, under New York law there is an implied contractual relationship between a State University and students enrolled in sports programs, and the evidence demonstrates that Killings' intentional assault prevented Fizulich from continuing his academic career at Albany. And lastly, this Court has subject matter jurisdiction because Fizulich has satisfied the damages threshold. As such, Killings has not met his burden under Rule 56 and is not entitled to judgment as a matter of law.

**STATEMENT OF FACTS**

On November 24, 2021, before a game at Eastern Kentucky University, Fizulich was violently pushed against a locker and slapped across the face by Coach Killings (the "Incident"). (Ex. 2 (Fizulich Tr.) at 72:13-14.) Although Killings later explained the Incident as accidental and claimed it was a mistake, the assault left other players and coaches concerned for Fizulich. *See* Fizulich Tr. at 76:13-20; 77:3-4; Ex. C Killings Tr. at 82:9; 83:17. Even Killings admitted the assault was inappropriate and that his immediate concern was "how to manage the situation." (Ex. 3 (Killings Tr.) at 83:17-21.)

1

The stress and anxiety related to the Incident made it impossible for Fizulich to continue as a player and he ultimately reported the assault to Albany on February 27, 2022. (Fizulich Tr. at 98-99; 107.) After reporting the assault, Fizulich made the decision to finish his coursework at home. *Id.* at 107. Albany then conducted an investigation into what happened, interviewing players and coaches who witnessed the Incident, as well as Fizulich and Killings. *Id.* at 109; *see also* Ex. 9 (investigator notes from interviews conducted with members of the Men's Basketball team). Brian Selchick ("Selchick"), the Director of Employee Relations and Training in the University's Human Resources office, led the investigation of Plaintiff's complaint that Killings pushed and slapped Plaintiff in the locker room in November 2021. (ECF No. 58-2 (Selchick Decl.) ¶¶ 6, 7.) The investigation supported Fizulich's account that the assault was intentional and inappropriate and determined that Fizulich's account of the Incident was credible. *See* Fizulich Tr. at 109; Selchick Decl. ¶ 11; Ex. 8 (Selchick notes from Plaintiff's interview); Ex. 9 (players' interviews confirming the same).

Though Albany was poised to terminate Killings following the investigation, it seemingly reversed the decision. *Id.* at 110:23-25 (Fizulich explaining that investigator did not believe Killings' account of the Incident and that "the next steps were going to be taken"); *see also* Ex. 26 Pryor Tr. 152:19-153:10 (Pryor's understanding that Killings was going to be terminated from Albany at 4:00 p.m. that day); Ex. 16 at 23 (text messages confirming the same); Ex. 28 at 1 ("the University is moving to terminate coach, and we're trying to get ahead of them"). After Killings retained a public relations firm, University of Albany employee Rodger Wyland "outed" Fizulich to the media as the student athlete who filed a complaint against Killings. (Ex. 1 (Amended Compl.) ¶¶ 8, 9; Fizulich Tr. at 208:21—209:3; *see also* Ex. 16 at 5; (Ex. 31 (Benson Tr.) at 59:7-61:21.) The media attention garnered support from Albany civil rights leaders, who protested the

2

decision to terminate Killings, a black male, over Fizulich, a white student's, complaint. *Id.*; *see also* Ex. 17 ("Black leaders call for transparency from UAlbany in investigation of men's basketball coach"). In lieu of termination, Albany suspended Killings for five games and imposed a $25,000 fine. (Fizulich Tr. at 208:21—209:3; ECF No. 58-1 (Rodríguez Decl.) ¶ 14.) Albany decided to offer Killings an "opportunity to redeem himself" and "decided not to pursue . . . termination." (Rodríguez Decl. ¶ 13.)

When Fizulich learned of the developments through the media, he contacted the University to discuss the decision but Albany refused. *Id.* at 209. Distraught over the Incident, and the mishandling of his complaint, Fizulich sought to transfer to another school's basketball program. Despite having several interviews, no school would accept him because the situation was "messy" as he was associated with the reported assault and publicity. *Id.* at 124; 125:17-22. Fizulich was also made aware by other individuals in the collegiate basketball community that Killings put a negative word out, causing him to be blacklisted. *Id.* at 127:12—128:15 (Fizulich giving examples); *see id.* at 131:15-16. Even D2 or D3 basketball programs would not accept Fizulich, despite his good grades and D1 experience. *Id.* at 131:18-20. After accepting that he would not be able to play basketball at the college level due to the Incident, Fizulich decided to finish his education at the College of New Jersey. *Id.* at 158:7-9.

## **LEGAL STANDARD**

When considering a motion for summary judgment, the Court is to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999). The Court may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for

the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant establishes a prima facie basis for summary judgment, the burden of production then shifts to the party opposing summary judgment, who must produce evidence to show the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

## **ARGUMENT**

**I.  THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF'S ASSAULT AND BATTERY CLAIMS**

Given the record demonstrates that Defendant Killings intentionally placed Plaintiff in apprehension of harmful conduct and made offensive contact, there remain triable issues of fact that preclude summary judgment on Count One, for Assault and Battery. Killings argues that Fizulich's claim for assault and battery fails because he "was not aware of the incoming contact and thus lacked the requisite perception to place one's mind in apprehension" and that "Killings did not intend to strike Fizulich, and the intended contact was justified." (ECF No. 57-21 at 10.) Plaintiff maintains that Killings' sudden, violent assault—pushing him against a locker and slapping him across the face—triggered an instant apprehension of harm. Any reasonable juror

4

could determine that a person in that situation would likewise perceive the threat of physical contact, and be placed in a state of apprehension. Moreover, there is a genuine dispute as to whether Killings intentionally slapped Fizulich. An open handed slap across the face is hardly accidental. As such, there are genuine issues of material fact which preclude granting summary judgment in Killings' favor.

### A. The Plaintiff Does Not Dispute that New York law Applies.

The Plaintiff does not dispute that New York choice-of-law rules apply.

### B. New York Assault and Battery.

Under New York law, assault "is an intentional placing of another person in fear of imminent harmful or offensive contact." *Tardif v. City of New York*, 991 F.3d 394, 410 (2d Cir. 2021). Killings argues that "there is no evidence of apprehension" but any reasonable person would fear harmful contact if they were suddenly pushed up against a locker. (ECF No. 57-21 at 11.) Fizulich testified that, just before the incident, the locker room was quiet—the music turned down and the players awaiting the coaches—when Killings suddenly made "a beeline" toward him. (Fizulich Tr. 71-72.) This abrupt approach would naturally place a reasonable person in apprehension of imminent harm, even Plaintiff's teammates were stunned by the sudden contact. *See* Ex. 9 (Selchick Interview Notes – Men's Basketball Team) at 2 ("Team was caught off guard"); *id.* at 7 ("slap was audible" and player "shocked"); *id.* at 10 ("hard contact – it was painful"); *id.* at 11 (player "surprised" and "slap was hard . . . not a pat"). Moreover, Fizulich further testified that Killings "pushed [him] into the locker, and he smacked [him] in the face with an open hand." *Id.* at 72:13-14.

Plaintiff has presented ample evidence to support a finding that he was in apprehension of harm. *Compare Holtz c. Wildenstein & Co.*, 261 A.D.2d 336, 336 (1st Dep't 1999) (dismissing assault claim because there was no evidence of physical conduct placing plaintiff in imminent

5

apprehension of harmful contact) *with Repetti v. Jacques*, No. 160267-2020, 2023 WL 2784459, at *2 (N.Y. Sup. Ct. Apr. 04, 2023) (granting summary judgment for plaintiff based on sworn affidavit and defendant's admission to hitting the plaintiff in the head). Although Killings contends that there is no evidence Fizulich was placed in imminent apprehension of a harm "because he never expected to be hit," it is the jury's responsibility to evaluate the evidence presented, assess witness credibility, and resolve factual disputes. (ECF No. 57-21 at 11.) On this record, a reasonable jury could conclude that Killings' conduct placed Plaintiff in imminent apprehension of harm, precluding summary judgment on the assault claim.

Likewise, there is no basis for dismissal of the battery claim because the evidence strongly supports a showing that the contact was intentional and wrongful. In New York, a civil claim for battery requires "intentional wrongful physical contact with another person without consent." *Tardif*, 991 F.3d at 410 (cleaned up); *see also* Restatement (Second) of Torts § 19 ("[a] bodily contact is offensive if it offends a reasonable sense of personal dignity."). Killings contends that his "intentions were pure," but these contentions go directly to witness credibility and factual determinations reserved for the jury. (ECF No. 57-21 at 11.) A reasonable juror could find that pushing a player into a locker and slapping him in the face constitutes intentional, offensive contact, rather than conduct intended merely to "excite the team" as Killings insists. *See* Selchick Interview Notes – Men's Basketball Team at 2 ("Team was caught off guard"); *id.* at 7 ("slap was audible" and player "shocked"); *id.* at 10 ("hard contact – it was painful"); *id.* at 11 (player "surprised" and "slap was hard . . . not a pat"). *See also Goff v. Clarke*, 302 A.D.2d 725, 727 (3d Dep't 2003) (affirming summary judgment where evidence raised genuine issue of material fact as to whether coach intended contact and whether it was offensive because witnesses heard player ask coach to stop); *see also*.*Cerilli v. Kezis*, 16 A.D.3d 363, 790 (2d Dep't 2005) (holding that

6

plaintiffs' allegations that defendant doctor performed a biopsy over express objections stated claim for battery).

In sum, the evidence establishes genuine disputes of material fact as to both assault and battery, and these issues must be resolved by a jury, not on summary judgment. *See also* Ex. 9 (Selchick Interview Notes – Men's Basketball Team). Accordingly, Defendant's motion for summary judgment should be denied.

## II. PLAINTIFF HAS RAISED GENUINE ISSUES OF MATERIAL FACT ON HIS TORTIOUS INTERFERENCE WITH CONTRACT CLAIM

Defendant's conduct, including the physical assault and his subsequent actions, create genuine issues of material fact as to whether he intentionally and improperly interfered with Plaintiff's contractual relationship with Albany. Under New York law, a claim for tortious interference with contract "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third party's breach of the contract without justification, actual breach of the contract, and damages resulting" from the breach. *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 241 (E.D.N.Y. 2007); *see also Lama Holding Company v. Smith Barney Inc.*, 88 N.Y. 2d 413, 424 (1996). All of these elements are present here.

Although Killings argues there is no evidence that Plaintiff's breach was caused by his actions, several genuine issues of material fact preclude summary judgment on Count Two. First, the question of whether a contract exists between Plaintiff and Albany is a question of fact that must be resolved by a jury. Second, there is a genuine dispute regarding Killings' knowledge of the contract between Plaintiff and Albany. And lastly, there is a question of fact as to whether Killings' wrongful conduct—a violent and inappropriate assault in the locker room—induced a breach of Albany's contract with Plaintiff. In sum, Killings has not met his burden under Rule 56

and is not entitled to judgment as a matter of law on Plaintiff's tortious interference of contract claim.

### A. Whether a Contract Exists Between Plaintiff and Albany is a Question of Fact for a Jury to Decide.

It is well established that in New York, "the relationship between a university and its students is contractual in nature, . . . and that specific promises set forth in a school's bulletins, circulars and handbooks, which are material to the student's relationship with the school, can establish the existence of an implied contract." *Rynasko v. New York Univ.*, 63 F.4th 186, 197 (2d Cir. 2023) (cleaned up). Whether there exists an implied contract between Fizulich and Albany is a question of fact that must be resolved by a jury. *See id.* at 198; *see also New Windsor Volunteer Ambulance Corps v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006).

As an employee of Albany, Killings was required to adhere to the University's policies, including the Campus and Workplace Violence Prevention Policy. Killings received a copy of this Policy during his employee orientation and confirmed that he read it and agreed to abide by its terms. Killings Tr. 50:2-52:15; *see also* Ex. 10 at 2; Ex. 29. Further, Killings had knowledge of Fizulich's contractual relationship with the University by nature of his position as Head Coach of the Men's Basketball team. (Killings Tr. at 47:14-17.) Specifically, Killings was aware Fizulich was a student enrolled at the University and a member of Albany's Basketball program. *Id*. Plaintiff's tortious interference claim is based on the premise that Killings' intentional assault disrupted him from continuing his education at Albany and prevented from participating in the Men's Basketball program. (Amended Compl. ¶ 89.)

Whether a contract exists between Plaintiff and Albany is a question of fact reserved for the jury. *See Rynasko*, 63 at 198; *New Windsor Volunteer Ambulance Corps*, 442 F.3d at 112. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that

8

Albany's express policies and specific promises created an implied contractual obligation to provide a safe, violence free educational and athletic environment. Killings, fully aware of Plaintiff's status as a student-athlete, intentionally engaged in conduct that violated those protections and directly undermined Plaintiff's ability to continue his education at Albany. The question of whether Killings improperly interfered with Plaintiff's contractual rights presents issues of fact and credibility that cannot be resolved on summary judgment. Accordingly, Defendant's motion must be denied.

### B. Killings Had Actual or Constructive Knowledge of the Contract Between Plaintiff and Albany.

Killings' contention that he lacked actual knowledge of the implied contract between Albany and Plaintiff is similarly unavailing and provides no basis for dismissal. Given his position as Head Coach, Defendant had every reason to be aware of the implied contract between Plaintiff, as a student-athlete, and Albany. *See Clogher v. New York Med. Coll.*, 112 A.D.3d 574, 575 (2013) ("The rights and obligations of the parties as contained in the [school's] bulletins, circulars and regulations made available to the student, become a part of this contract").

Even so, Killings admitted that he is responsible for managing and awarding athletic scholarships at Albany. (Killings Tr. at 47:14-17.) Fizulich was offered a position on Albany's Men's Basketball team with the understanding that he would earn a full scholarship for his junior and senior year. *See* Fizulich Tr. 58-59 (Plaintiff explaining that Killings communicated about scholarship with his high school basketball coach); Killings Tr. at 45-46 (Killings explaining Fizulich "was on the way to earn [the scholarship]"). As the person responsible for awarding athletic scholarships to basketball players, Killings was certainly aware of the University's other underlying and implied contractual relationships with student-athletes. Any reasonable juror could find that Killings, by virtue of his position as an employee of the institution and as Head Coach of

9

the Men's Basketball team, had actual knowledge of Albany's underlying contractual relationship with Plaintiff. Accordingly, Killings' motion for summary judgment must be denied.

### C. There is a Question of Fact as to Whether Killings' Wrongful Conduct Induced a Breach of Albany's Contract with Plaintiff.

Furthermore, there is a question of fact as to whether Killings' wrongful conduct—a violent and inappropriate assault in the locker room—induced a breach of Albany's contract with Plaintiff. Defendant erroneously frames Plaintiff's tortious interference with contract claim as stemming from Albany's decision not to terminate him. Killings misconstrues the basis of the claim. Instead, Plaintiff has alleged that it was implicit in his contractual relationship and expressly provided by Albany's policies, that students like him are promised a safe environment in their continued education and participation in programs like Albany's Men's Basketball team. *See Rynasko*, 63 at 197 (holding that "specific promises" in a school's policies "can establish the existence of an implied contract"). Indeed, Albany's Campus and Workplace Violence Prevention Policy and Program (the "Policy") guarantees students, such as Plaintiff, certain community standards designed to promote safety, an environment free of violence, and a "zero-tolerance" policy regarding acts of violence. (Amended Compl. ¶¶ 63–64, 109.)

Notwithstanding, Killings violated the Policy when he assaulted Plaintiff by pushing him into a locker and slapping him across the face, in November of 2021. He thereafter failed to report the matter to administration of Albany, to the Office of Human Resources Management, the Director of Athletics, or the parents of Plaintiff, in violation of the University's policies. Ex. 12 at 1; Killings Tr. 98-100. Additionally, despite assuring his staff, in a meeting held on November 29, 2021 that he would report the violation to the administration and to Plaintiff's parents, after basketball team staff members advised him of the inappropriateness of the contact, he still failed to report the violation as promised and as required by the Policy. Ex. 12 at 1; Killings Tr. 98-100.

10

Killings' inappropriate conduct, and the failure to report it thereafter, caused Albany to violate its assurances to Plaintiff, as a student of the University, that it had a "zero tolerance" policy against violence.

Furthermore, following the investigation, Defendant Killings through his attorney hired a public relations firm to deal with the "media scrutiny." (Killings Tr. at 133-134.) These actions drew out well-known Albany civil rights leaders and Albany donors, including Marcus Pryor and Alice Green, who protested the decision to terminate Defendant Killings. *Id.* ¶¶ 9, 58. *See also* Exs. 16, 17, 18, 19, 22, 27, 28. Pryor organized a rally to show support for Killings, which was held on March 31, 2022. *See* Killings Tr. At 138-141; *see also* Exs. 17, 18. The rally, along with additional media coverage, led Albany to reverse its initial decision to terminate Killings from his employment, and instead imposed a five-game suspension and $25,000 fine. Thus, Killings' actions in gathering a team of local community leaders and activists to speak out on his behalf and call into question the fairness of Albany's investigation, caused Albany to succumb to this external pressure and reverse its initial decision to terminate, without any consideration for Fizulich's safety or well-being, as guaranteed by its policies. (Amend. Compl. ¶¶ 9, 59.) Based on the foregoing, Killings' actions in assaulting Plaintiff and failing to properly report the matter, followed by his retention of a team of community leaders and University donors, induced Albany to breach its contract with Plaintiff, when the University failed to enforce its "zero tolerance" policy against violence on campus. Whether Killings' conduct induced this breach is a question that must be resolved by a jury. *See Bogoni v. Friedlander*, 197 A.D.2d 281, 286 (1st Dep't 1994).

For the foregoing reasons, summary judgment on Plaintiff's tortious interference claim should be denied. Genuine disputes of material fact exist as to whether Defendant intentionally and wrongfully interfered with Plaintiff's contractual relationship with Albany, causing him

11

reputational harm and loss of educational and athletic opportunities. A reasonable jury could conclude that Killings' actions were improper and directly caused Plaintiff's damages. These factual questions are for the jury to resolve, and inappropriate to be decided on summary judgment.

### III. PLAINTIFF HAS SATISFIED THE AMOUNT IN CONTROVERSY REQUIREMENT

Defendant's motion for summary judgment must further be denied because Plaintiff has established that the amount in controversy exceeds $75,000, as required pursuant to 28 U.S.C.A. § 1332(a). Although Killings argues that this Court should dismiss this action for lack of subject matter jurisdiction, Defendant has not established to a legal certainty that Plaintiff's claim is worth less than the jurisdictional threshold. (ECF No. 57-21 at 18.) On the contrary, the nature of Killings' conduct and resulting harm plainly demonstrate that more than $75,000 is in controversy.

At the summary judgment stage, the relevant inquiry is whether it appears to a legal certainty that the plaintiff cannot recover damages exceeding $75,000. *See Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996). As long as the plaintiff's claims were brought in good faith, dismissal for failure to satisfy the amount in controversy requirement is only appropriate if the defendant shows it is legally impossible for the plaintiff to recover the jurisdictional amount. *Id.* (the court "must afford plaintiff an appropriate and reasonable opportunity to show good faith in believing that a recovery in excess of jurisdictional amount is reasonably possible") (cleaned up). The Second Circuit has made clear that overcoming this presumption is an exceptionally high burden, "the legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim." *Lujan v. Sensio Co. (US) Inc.*, No. 24-CV-3479 (LJL), 2025 WL 834835, at *3 (S.D.N.Y. Mar. 14, 2025) (cleaned up); *Chase Manhattan Bank, N.A.*, 93 F.3d at 1070.

12

Though Plaintiff suffered minor physical harm due to the Incident, he suffered significant emotional and psychological harm. Courts routinely aggregate damages to allow a plaintiff to satisfy the damages threshold. *Crouch v. Atlas Van Lines, Inc.*, 834 F. Supp. 596, 604 (N.D.N.Y. 1993) (explaining courts can aggregate all of the plaintiff's claims against one defendant to satisfy the amount of controversy requirement). As such, the Court must look beyond Fizulich's damages related to his medical treatment to determine if it is a legal impossibility to recover at least $75,000.

Moreover, although Killings argues Fizulich's emotional and psychological damages are too speculative to recover and a jury would not value them highly, there is sufficient evidence on the record for a jury to find the Plaintiff suffered cognizable and compensable harm. Fizulich sought counseling after the Incident and suffered from anxiety and depression. (Ingersoll Tr. at 19, 33.) His own testimony revealed that he delayed reporting the incident because he was embarrassed. (Fizulich Tr. at 85:15-17.) Damages are considered "too speculative" only where there is no concrete proof of actual, identifiable loss. *See Portus Singapore PTE LTD v. Kenyon & Kenyon LLP*, 449 F. Supp. 3d 402, 421 (S.D.N.Y. 2020), *aff'd sub nom. Portus Singapore Pte Ltd. v. Kenyon & Kenyon LLP*, 843 F. App'x 389 (2d Cir. 2021) (granting summary judgment because alleged damages were "too speculative and incapable of being proven with any reasonable certainty"); *see also Brown v. Samalin & Bock, P.C.*, 168 A.D.2d 531, 563 N.Y.S.2d 426, 426-27 (1990). At the summary judgment stage, the Plaintiff must demonstrate that the claimed damages are supported by competent evidence, rather than proving exact dollar amounts. *Diamond v. Sokol*, 468 F. Supp. 2d 626, 634 (S.D.N.Y. 2006), *on reconsideration*, No. 05 CIV. 4993 (GEL), 2007 WL 9815944 (S.D.N.Y. May 18, 2007) (explaining that to survive summary judgment plaintiff must show "that a reasonable jury could find in her favor on the existing record"). Any reasonable jury could find that based on the evidence presented, Fizulich sustained significant emotional and

13

psychological harm caused by the Incident, including reputational harm, and the loss of future educational and athletic opportunities. *See id.*

Taken together, Fizulich's claims clearly place more than $75,000 in controversy. Plaintiff asserts claims for assault and battery as well tortious interference with contract against Killings. (Amended Compl. ¶¶ 14-16.) The damages flowing from Killings' conduct includes not only physical and emotional harm, but also interference with Plaintiff's contractual relationship with Albany as a student-athlete. *Id.* ¶ 91. Plaintiff seeks damages for physical harm; emotional and psychological harm; and reputational harm. Claims of this nature, particularly where the plaintiff has alleged both economic and non-economic harm routinely exceed the amount in controversy requirement. *See Lujan*, No. 24-CV-3479 (LJL), 2025 WL 834835, at *5 (holding that defendants did not establish to a legal certainty that a jury could not properly award plaintiff $75,000 in noneconomic damages). Courts regularly permit aggregation of multiple claims and recognize that emotional distress, reputational loss, and interference with contractual relations are compensable harms. *Crouch*, 834 F. Supp. at 604. It cannot be said to a legal certainty that Plaintiff's claims in the aggregate do not satisfy the amount in controversy requirement.

Given that Defendant has failed to demonstrate to a legal certainty that Plaintiff's recovery would be less than $75,000, Defendant's motion for summary judgment for lack of subject matter jurisdiction must be denied.

## CONCLUSION

For the foregoing reasons, Defendant Killings' motion for summary judgment should be denied in its entirety. Genuine disputes of material fact remain, and Plaintiff has presented sufficient evidence to support his claims and to satisfy the amount in controversy requirement under § 1332(a). These issues are properly reserved for the jury, not resolved on summary judgment. Accordingly, this case should proceed to trial, where Plaintiff will have the opportunity to present his claims to a jury.

**Dated: September 8, 2025**

        **Respectfully submitted,**
        **NESENOFF & MILTENBERG, LLP**
        *Attorneys for Plaintiff Luke Fizulich*

        **By: /s/ Stuart Bernstein**
        **Stuart Bernstein, Esq.**
        **Tara J. Davis, Esq.**
        **363 Seventh Avenue, Fifth Floor**
        **New York, New York 10001**
        **(212) 736-4500**
        sbernstein@nmllplaw.com
        tdavis@nmllplaw.com