Exhibit 3

Page 1

1
2

UNITED STATES DISTRICT COURT
3   NORTHERN DISTRICT OF NEW YORK
-------------------------------------------X
4   LUKE FIZULICH,
5                                 PLAINTIFF,
6

-against-          Case No.:
7                                 1:22-CV-1190
DNH/DJS
8

9   DWAYNE KILLINGS, (in his individual
capacity only) and STATE UNIVERSITY OF
10  NEW YORK AT ALBANY ,
11                                 DEFENDANTS.
-------------------------------------------X
12                  DATE: December 23, 2024
13                  TIME: 10:00 a.m.
14
15
16          DEPOSITION of the Defendant,
17  DWAYNE KILLINGS, taken by the Plaintiff,
18  pursuant to a Notice and to the Federal
19  Rules of Civil Procedure, held via Zoom,
20  before Stephanie Turetsky, a Notary Public
21  of the State of New York.
22
23
24
25

Page 2

1
2    A P P E A R A N C E S:
3
4    NESENOFF & MILTENBERG LLP
         Attorneys for the Plaintiff
5        LUKE FIZULICH
         101 Federal St. 19th Floor
6        Boston MA 02110
         BY:  TARA DAVIS, ESQ.
7        Tdavis@nmllplaw.com
         212-736-4500
8
9    DREYER BOYAJIAN LLP
         Attorneys for the Defendant
10       DWAYNE KILLINGS
         75 Columbia St.
11       Albany NY 12210
         BY:  WILLIAM J. DREYER, ESQ.
12           JUSTIN DAVIS, LAW CLERK
         Wdreyer@dblawny.com
13
14
     NEW YORK STATE
15   OFFICE OF THE ATTORNEY GENERAL
         Attorneys for Defendant
16       THE STATE UNIVERSITY OF NEW YORK
         AT ALBANY
17       28 Liberty Street, 18th Floor
         New York NY 10005
18       BY: MARK G. MITCHELL, ESQ.
         Mark.mitchell@ag.ny.gov
19
20
21   THE STATE UNIVERSITY OF NEW YORK,
     UNIVERSITY AT ALBANY
22       1400 Washington Ave
         Albany Suite 208
23       Albany NY 12222-0100
         BY: AMANDA MALESZWESKI, ESQ.
24       Amaleszweski@albany.edu
         518-956-8050 Chief Campus Counsel
25

Page 3

1

2

3    LEE BOWRY, Videographer

        Cambridge Video Productions

4

5    Present:   LUKE FIZULICH, Plaintiff

6

                *           *           *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2    F E D E R A L   S T I P U L A T I O N S

3

4    IT IS HEREBY STIPULATED AND AGREED by and
between the counsel for the respective
parties herein that the sealing, filing and
5    certification of the within deposition be
waived; that the original of the deposition
6    may be signed and sworn to by the witness
before anyone authorized to administer an
7    oath, with the same effect as if signed
before a Judge of the Court; that an
8    unsigned copy of the deposition may be used
with the same force and effect as if signed
9    by the witness, 30 days after service of
the original & 1 copy of same upon counsel
10   for the witness.
11   IT IS FURTHER STIPULATED AND AGREED that
all objections except as to form, are
12   reserved to the time of trial.
13                  *    *    *    *
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    D KILLINGS
 2   question before taking the break.  Okay?
 3        A.    Yes.
 4        Q.    Is there any reason that you
 5   are unable to provide truthful testimony
 6   today?
 7        A.    No.
 8        Q.    And have you consumed any
 9   alcohol or taken any drugs, prescription or
10   otherwise, that might affect your ability
11   to testify?
12        A.    No.
13        Q.    And you are sitting in a room
14   with your attorneys.  Is that correct?
15        A.    Yes.
16        Q.    Is there anyone present in that
17   room other than counsel?
18        A.    No.
19        Q.    Do you have any documents in
20   front of you?
21        A.    Tea and a note card.
22        Q.    And is that a note card with
23   notes that you drafted?
24        A.    Yes.
25        Q.    Is it like, when you say note
```

```
                                        Page 36
 1                  D KILLINGS
 2   well?
 3        A.    Not before.
 4        Q.    Not before beginning the
 5   position?
 6        A.    Correct.
 7        Q.    At some point after beginning
 8   the position did you speak with him about
 9   him coming over to Albany?
10        A.    Yes.
11        Q.    Do you recall when that was?
12        A.    I don't know exact dates.  I
13   got a call from Allison Kellaher, who
14   worked at the office at Marquette.  And she
15   was basically -- Luke was frustrated with
16   his new role as a walk on under new coach
17   Shaka Smart.  I didn't just coach a man to
18   walk on.  It is different.  Their role was
19   different than what he was used to.  That
20   was the beginning of the conversation.
21        Q.    Do you recall when that was?
22        A.    I would not remember the exact
23   date, no.
24        Q.    Did you have a conversation
25   with Luke directly at some point about
```

Page 45

                    D KILLINGS

1
2   you told him there may be -- I don't know
3   how you phrased it.  He may earn a
4   scholarship for year two, meaning a second
5   year at Albany.  Did you make any
6   assurances about a scholarship in year
7   three?
8        A.    Well, I mean, in my mind, if
9   you get a scholarship, you have it unless
10  you do not do well academically or you are
11  not consistent on campus.
12       Q.    You would have it for all the
13  years barring anything?
14       A.    Yes.  We had one kid here who
15  lost his scholarship because he did not do
16  well academically.
17       Q.    Was there anything that the
18  scholarship you discussed with Luke, was it
19  contingent on anything, or just show up and
20  play?
21       A.    No, it was contingent on the
22  things I just said.  Being consistent.
23  We do a lot of community work here.  He did
24  a great job.  With being a good student,
25  which he was a very good student.  And

```
 1                    D KILLINGS
 2    having good work ethics.  Coming in every
 3    day to practice and doing all the things we
 4    talked about doing.  We had a thing we
 5    called an every day guy, about a guy that
 6    comes in every day and works.  And
 7    typically he is one of the guys we talked
 8    about you.  Do not get the scholarship
 9    until the end of the season.  But he was on
10    the way to earn it.
11         Q.    So you mentioned basically
12    three things.  Assuming he did those three
13    things he would have the scholarship in his
14    second year at Albany going forward.  Is
15    that right?
16         A.    Yes.
17         Q.    And there was nothing in terms
18    of the scholarship being contingent on
19    anything?  It was not contingent on his
20    performance on the court.  Is that right?
21    Meaning he did not have to play a certain
22    amount of minutes or make a certain number
23    of baskets or anything like that?
24         A.    No.  Just about habits.
25         Q.    And was that scholarship offer
```

```
1                    D KILLINGS
2    written down anywhere?
3         A.    No.
4         Q.    It was just verbally told to
5    Luke and his parents?
6         A.    Yes.
7         Q.    And in your mind, would that be
8    binding?
9         A.    Yes.  It is very typical in our
10   world in athletics.  You tell a family or
11   student, if you do this, at the end of the
12   year, you will have an opportunity to get a
13   scholarship.
14        Q.    And as the head coach, you have
15   the authority to make those decisions.  Is
16   that right?
17        A.    Yes.
18        Q.    Are you familiar with the term
19   featured player?
20        A.    No.
21        Q.    Do you recall, you do not
22   recall telling plaintiff or his parents
23   that he would be a featured player at
24   Albany?
25        A.    No.  I told them he would have
```

```
                                    Page 50
 1                 D KILLINGS
 2       Q.    Do you recall any discussions
 3  or presentations about the Workplace,
 4  Violence Prevention Policy?
 5       A.    I do not recall.
 6       Q.    Does that policy sound familiar
 7  to you?
 8       A.    Yes.
 9       Q.    You just do not remember if
10  there was any trainings on that?
11       A.    I don't remember.
12       Q.    Have you read the policy?
13       A.    Yes, I read it a lot in the
14  spring of 2022.
15       Q.    Have you read it since then?
16       A.    I did a -- I believe there was
17  another training on it in November or
18  September, maybe, online.
19       Q.    What is your understanding of
20  what that policy addresses?
21       A.    Addresses a lot of different
22  things in regards to student issues,
23  employee issues.  I don't know the whole
24  thing word for word.
25       Q.    Do you recall that it addresses
```

```
 1                   D KILLINGS
 2   violence in the workplace?
 3        A.    Yes.
 4        Q.    Do you recall whether it
 5   addresses physical contact with other
 6   people on campus?
 7        A.    I don't recall.
 8        Q.    I am showing you what will be
 9   marked as Plaintiff's Exhibit 2.
10             (WHEREUPON Plaintiff's Exhibit 2
11          was marked for ID.)
12        Q.    Are you able to see this
13   document?
14        A.    Yes.
15        Q.    It says UAlbany Policy
16   Attestation.  Do you recognize this?
17        A.    Yes.
18        Q.    Is that your signature at the
19   bottom of the document?
20        A.    Yes.
21        Q.    And this lists out a number of
22   policies.  It says you attended an
23   orientation session where we discussed the
24   policies and compliance mandates as
25   follows:  One of them is the Campus and
```

```
                                            Page 52
 1                    D KILLINGS
 2    Workplace Violence Prevention Policy and
 3    Program.  Do you see that?
 4         A.     Yes.
 5         Q.     Can you read into the record
 6    the last paragraph on the bottom of the
 7    form?
 8         A.     I understand these Compliance
 9    Materials and I agree to abide to all rules
10    and regulations described therein including
11    but not limited to my obligation to report
12    violations of any of these policies.  And I
13    acknowledge and agree my failure to comply
14    will result in disciplinary action up to
15    and including termination.
16         Q.     Does reading this form refresh
17    your recollection as to anything that was
18    discussed about these policies?
19         A.     I don't recall if it was the
20    lecture hall or one you do ten ten of them
21    online, but a different sequence.  But I do
22    recall signing this paper.
23               MS. DAVIS:  Can we take a five
24         minute break?
25               MR. DREYER:  I need then
```

```
 1                    D KILLINGS
 2    assistant, you can be a little bit more, be
 3    there.  Kind of like play around with the
 4    guys and just have a chance to have more
 5    time with them than as a head coach.  I
 6    don't think I changed, but it was hard for
 7    me to give my time in the way I wanted to
 8    as a head coach versus being an assistant.
 9         Q.    Do you feel added pressure
10    becoming a head coach for the first time?
11    How was that experience?
12         A.    I was excited.  The first,
13    shoot, seven, eight, nine games, I was so
14    excited to be able to do it.  That was the
15    biggest thing for me.  I never felt
16    pressure.  Just like excitement to coach
17    and go through the highs and lows and
18    moments.  The journey of it all.  And it
19    was a little weird because it was COVID so
20    it was just not like a normal experience to
21    start out with.  Talking to people.  And
22    you have fans one game and do not the next.
23    The losing players because of COVID and all
24    that.  There was a stretch where Luke had
25    an opportunity to play extended minutes.  I
```

```
                                        Page 75

 1                    D KILLINGS
 2   Sanger.
 3        Q.    Is she not currently the
 4   trainer?
 5        A.    She is no longer with the
 6   university.
 7        Q.    Do you admit that you pushed
 8   Luke in the locker room before the game on
 9   November 24th?
10        A.    I did not push Luke.
11        Q.    Did you put your hands on him
12   in any way?
13        A.    There was contact made.
14        Q.    What was the contact that was
15   made?
16        A.    Incidental contact to him.
17        Q.    What do you mean by incidental?
18        A.    So Luke, going backwards, the
19   Kentucky game, pregame.  Donors were
20   present.  I believe there was a reporter
21   present inside the room.  What we always do
22   is go through and tell people and talk the
23   culture.  And for that year, we were a very
24   energetic group.  We were excitable.  I
25   guess that is the right word to use at that
```

```
 1                    D KILLINGS
 2   point in the year.  After DOC, you get
 3   instructions, play music and a mosh pit, if
 4   you will.  Before the Kentucky game, Luke
 5   pushed me in a playful manner.  He just --
 6   he was the kind of kind of guy who hit
 7   lockers and kind of let's go, come on guys.
 8   Whatever it may be.  Before that game, that
 9   happened.  Our guys were really excited to
10   play.  We go out.  At least for the
11   Kentucky game, I wanted to make sure they
12   were ready to go, meaning excited, alert,
13   awake.  So after the DOC, he was standing
14   -- seated to my left.  Music comes on.  I
15   wanted to bring him in and like yell, let's
16   go.  Get him fired up.  I thought in my
17   mind get everybody else fired up.  And
18   instead I made contact with his face.
19        Q.    Can you describe that a bit
20   more with how you made contact with his
21   face?
22        A.    He is seated to my left.  Music
23   comes on.  I turn to bring him in.  He is
24   seated to my left.  When I go this way, I
25   make contact with his face.
```

```
 1                    D KILLINGS
 2              MR. DREYER:  Maybe describe
 3         what he is doing for the record.
 4         Q.    He is to your left, and you
 5    take your right hand.  Is that what you are
 6    doing?
 7         A.    Yes.  Right hand.  I would have
 8    been -- I don't remember who was the scout
 9    for the game.  When I say scout, one of the
10    assistants would go through details of the
11    other team.  They will finish and I may
12    give instructions.  I may just say let's go
13    depending on the team we are playing, time,
14    what else has been said.  So behind us is a
15    very small locker room at Eastern Kentucky.
16    Behind us, somebody would play music.
17    Music comes on.  I take my right hand, I
18    was going to turn it like I was going to
19    bring him in to me, like pull him in,
20    because he had let go.  And get the group
21    ready and excited.  Most guys are already
22    on their feet.  And when I take my right
23    hand I made contact with his face.
24         Q.    What side of his face did you
25    make contact with?
```

```
 1                    D KILLINGS
 2        A.     I believe it would have been
 3    his left side of his face.
 4        Q.     Okay.  How hard was that
 5    contact?
 6        A.     If you were going on a scale of
 7    one to ten -- If I am making him throwing
 8    his body into me, from a scale of one to
 9    ten, maybe a six.
10        Q.     Do you know where your hand
11    made contact with his face, was that the
12    side the stitches were on his lip?
13        A.     I don't recall that.  I do
14    recall once all this kind of went through
15    and I thought to go through the medical
16    report, the contact was not, it was not
17    strong enough to make any, make his
18    stitches lose or anything like that.  Post
19    game, like, she would do every game, she
20    evaluated his stitches and said there was
21    no concern, no blood.
22        Q.     Did you actually have a
23    conversation with the trainer about the
24    stitches after the game?
25        A.     No.  I was saying when all this
```

Page 82

```
 1                    D KILLINGS
 2    date?
 3         A.    No, nothing to do with
 4    stitches.  Just submitting documents for
 5    discovery.
 6         Q.    Do you believe that the contact
 7    that you made with Luke's face on November
 8    24th was inappropriate?
 9         A.    It was an accident.  When it
10    happened, my immediate thing was how he and
11    the rest of the guys will take it.  I
12    remember one student laughing when it
13    happened.  I knew nobody knew it was intent
14    to harm Luke or inflict pain on him.  It
15    was just more of how -- it did not go the
16    way it was going to go in my mind.  So
17    then, now, what is the next thing to do?
18         Q.    Again, do you believe that the
19    contact was inappropriate for a head coach
20    to make contact in that manner with a
21    player?
22         A.    It was an accident.  And
23    immediately my thought was I needed to make
24    sure that I guess I handled this in the
25    right way.
```

```
                                    Page 83

 1                 D KILLINGS
 2        Q.    I ask one more time.  You are
 3   not really answering the exact question I
 4   am asking, which is do you believe it was
 5   inappropriate?  Yes or no?
 6              MR. MITCHELL:  I object to the
 7         form.
 8              MS. DAVIS:  On what basis?
 9              MR. MITCHELL:  Asked and
10         answered.
11              MS. DAVIS:  Has not answered my
12         question.  He has given me a
13         different answer.
14              MR. MITCHELL:  I'm putting my
15         objection on the record.
16        Q.    You can answer?
17        A.    It was a mistake.  It was not
18   my intent.  Was it inappropriate?  I guess
19   you could say it was inappropriate.  My
20   concern next was how to manage the
21   situation.
22        Q.    Let me show you what I'm going
23   to mark as Exhibit 7.
24              (WHEREUPON Plaintiff's Exhibit
25         7 was marked for ID.)
```

Page 95

1                        D KILLINGS

2          Q.     At the airport, were you

3     sitting with the full team at the gate?

4          A.     The team was kind of like

5     around.  It is at the gate.  Some guys are

6     in one area.  Scattered about.

7          Q.     And where were you sitting?

8          A.     I was actually standing and he

9     was walking or I was walking in his

10    direction or visa versa.  And I went up to

11    him to speak to him.

12         Q.     What did you say?

13         A.     I apologized to him.  And I

14    explained to him that was not what I wanted

15    to happen.  And I remember he said

16    something to the fact that I don't want the

17    guys making fun of me in the locker room.

18         Q.     What exactly did you say to

19    apologize?  Do you remember what your

20    exactly words were?

21         A.     I don't remember the exact

22    words.

23         Q.     Did you specifically say I'm

24    sorry?

25         A.     I definitely apologized to him,

Page 96

1                    D KILLINGS
2   yes.
3        Q.    Okay.  And what was his
4   demeanor during this conversation?
5        A.    I would say frustrated.  And
6   everybody is ready to go home.
7        Q.    Anything else you recall about
8   the substance of that conversation with
9   Luke at the airport?
10        A.    No.
11        Q.    How did you two leave things
12   off at the end of that conversation?
13        A.    I don't remember.
14        Q.    Was it your impression that
15   things were fine or did he seem upset?
16   What was your impression of him?
17        A.    I don't remember how it ended,
18   but I remember saying to myself I want to
19   give him some space.
20        Q.    Do you recall a conversation
21   with the assistant coaches where you used
22   the phrase we can be demanding without
23   being demeaning?  Does that ring a bell?
24        A.    I do not recall that.
25        Q.    That does not sound familiar to

```
                                    Page 98

 1                    D KILLINGS
 2   incident?  I'm referring the physical
 3   contact with Luke?
 4        A.    I gave them an update on Luke.
 5   That I talked to him at the airport.  I
 6   talked to him while he was home that he
 7   would not be coming back right back because
 8   he was sick.  I think somebody asked me was
 9   he sick because of -- was he not coming
10   back because of this and not really sick.
11   I talked to his mom.  He was in the urgent
12   care and had a fever.  And I talked to the
13   guys about what I was going to say to the
14   players at practice.
15        Q.    Was there any discussion during
16   this meeting with the coaches about whether
17   to report the contact to the university?
18        A.     I think Tibbs got there late
19   and asked me what I was going to do in
20   regards to telling Vic or Mark.  He
21   explained that he went through a situation
22   at Vermont.  And I said to him I was
23   planning on it.  I was still thinking about
24   it.  I wanted to talk to Luke again and
25   talk to the team.
```

```
                                        Page 99
 1                 D KILLINGS
 2        Q.     You told him you were planning
 3   on reporting it?
 4        A.     Yes.
 5        Q.     But you did not report it to
 6   the university?
 7        A.     After talking to the team,
 8   everybody saw that it was not like a thing.
 9   And that is the only reason.  I thought it
10   was one of the crazy things that happen
11   with basketball every other day and I
12   didn't see it as something I needed to
13   report.
14        Q.     What was it about talking to
15   the team that gave you the impression that
16   people did not think it was a thing?
17        A.     Because every player was saying
18   I know you did not try to hurt him.  That
19   is not what you were trying to do.  A bunch
20   of guys saying I just want to keep playing
21   and let's move past that.  That was my
22   judgment.  And in talking with Mark and
23   Vic, I learned from my first year as a head
24   coach.  But I was really kind of banking on
25   them.
```

```
 1                  D KILLINGS
 2        Q.    Do you acknowledge now that you
 3   should have reported it to the university?
 4        A.    I should have had a
 5   conversation with either Vic or Mark as
 6   soon as we got back and when we got to the
 7   airport.
 8        Q.    Was there any discussion going
 9   back to that coaches' meeting that happened
10   after Thanksgiving, was there any
11   discussion whether to tell Luke's parents
12   what had happened?
13        A.    I don't recall that, no.
14        Q.    Do you recall if any of the
15   assistant coaches suggested that you do
16   call them and tell them?
17        A.    I don't recall that.  I
18   remember talking about it beforehand to
19   Mark Benson, but not to the parents.
20        Q.    And you never spoke to Luke's
21   parents to tell them what happened.  Is
22   that right?
23        A.    No, I didn't.
24        Q.    Was there a team meeting during
25   which again, post Thanksgiving, was there a
```

```
                                         Page 101
 1                    D KILLINGS
 2   team meeting during which the incident was
 3   addressed with the team?
 4        A.    Yes.  Right before practice
 5   after Thanksgiving.  I don't know the date.
 6   Right before practice after Thanksgiving.
 7        Q.    Was this the first practice
 8   back after the holidays?
 9        A.    Yes.
10        Q.    And was Luke still out sick?
11        A.    He was not with us.  He was
12   sick.
13        Q.    What did you say to the team
14   during that meeting?
15        A.    I don't recall what I said to
16   them, but we addressed it and I think I
17   might have said anybody have anything to
18   say or talk about come to see me
19   individually in the office.  And I was
20   around for a while.  Two guys came to the
21   office.  They came to talk about other
22   things.  Not that.
23        Q.    Did you have any communication
24   with Luke's parents during the remainder of
25   that season?  So post November 20th of
```

Page 121

                     D KILLINGS

1

2    meeting took place?

3         A.    I don't remember date.  I do

4    not.

5         Q.    Do you remember what was

6    discussed at that meeting?

7         A.    In that meeting, I am I

8    guessing we were looking at options of

9    what's next.

10        Q.    Was there a discussion about

11   resigning from your position during that

12   meeting?

13        A.    No.

14        Q.    Did you at some point agree

15   that you would resign as a result of the

16   November 24-2021 incident?

17        A.    No.

18        Q.    Did the option of resignation

19   ever come up in any of these meetings or

20   discussions?

21        A.    Not that I recall.

22        Q.    That was never, resignation was

23   never on the table?  That was not

24   discussed?  Is that what you said?

25        A.    Not that I recall.

Page 122

1              D KILLINGS
2              (WHEREUPON Plaintiff's Exhibit
3         4 was marked for ID.)
4         Q.    Do you recognize this document?
5    Are you looking at it?
6         A.    Yes.  I mean, I don't remember
7    it, but yes, I know what it is.
8         Q.    I will show you down here to
9    make sure.  The last page.  Is that your
10   signature?
11        A.    Yes.
12        Q.    Fair to say you read this at
13   some point?
14        A.    I have a copy of it.
15        Q.    What is it?
16        A.    That was the agreement document
17   that I signed when I got off of alternate
18   leave to return to work, and it was an
19   agreement to suspension of games and pay a
20   fine and submit an apology letter to the
21   university.
22        Q.    I will direct you down to page
23   3.  Did you review this document in full
24   before you signed it?
25        A.    Yes.

```
 1                    KILLINGS
 2  conference back at work he sat with me.
 3  Kind of helped me prepare myself for being
 4  back in front of the media.
 5        Q.    And when you say he, who are
 6  you referring to?
 7        A.    Steve Greenberg.
 8        Q.    He is from Greenberg Public
 9  Relations, I presume?
10        A.    Yes.
11        Q.    Did you hire Greenberg at some
12  point?
13        A.    I personally did not.
14        Q.    Did someone on your behalf hire
15  them?
16        A.    He was working for the lawyer I
17  had at the time.
18        Q.    And the lawyer you had at the
19  time was Steven Weinraub?
20        A.    Weinraub.
21        Q.    Did David hire Greenberg Public
22  Relations on your behalf?
23        A.    He was already doing work for
24  David.  He came in the room, for lack of a
25  better term, because of all the media
```

```
 1                    KILLINGS
 2   scrutiny that was on me.
 3       Q.    I guess I'm trying to
 4   understand, was Greenberg specifically
 5   contacted on your behalf in relation to the
 6   media attention that was happening in March
 7   of '22?
 8       A.    He was brought in because of
 9   all the media that was out there.  There
10   was a lot of press.  Media around.
11       Q.    And what was Steven's role
12   supposed to be?
13            MR. DREYER:  I'm objecting to
14         getting too far into that
15         relationship, because if he was hired
16         by Mr. Weinraub, then he also shares
17         the privilege with Mr. Weinraub's
18         office under certain circumstances.
19         So you can answer that question if
20         you can.
21       A.    I mean, I don't really know
22   other than, yes, he served as like a
23   consultant with the media.  What's next?
24   How I was going to communicate things?  I
25   guess preparing for something I never had
```

```
 1               KILLINGS
 2       somebody who is part of the legal
 3       team.  I think that conversation that
 4       you are asking him to describe for
 5       the record falls within the
 6       privilege.
 7            MS. DAVIS:  You have noted your
 8       objection.  I'm not clear what the
 9       relationship was.  I will move on.
10       Q.    Are you aware of a rally that
11  was held on March 31st, 2022 in Albany that
12  concerned you in some respect?
13       A.    Yes.
14       Q.    How did you come to learn about
15  that?
16       A.    Pretty much everything that was
17  going on with this whole thing ended up on
18  social media.
19       Q.    Okay.  How did it end up on
20  social media?
21       A.    I don't know the answer to
22  that.
23       Q.    Are you saying you learned
24  about the March 31st rally through social
25  media?
```

1                   KILLINGS

2        A.    I knew it was happening on

3   social media.  A bunch of people were

4   talking about it.  I got text messages

5   saying they were going to be there.  Many

6   of which I could not respond to because I

7   was still on alternate assignment.  So

8   information travels fast in town regarding

9   that.

10        Q.    Did you have any knowledge

11   about the fact that the rally would be

12   taking place prior to March 31st?

13        A.    Marcus Pryor told me there

14   would be potentially an event to try to

15   show support.

16        Q.    And when did he share that with

17   you?

18        A.    I don't know the exact date,

19   but would probably be two or three days

20   before it actually happened.

21        Q.    Who is Marcus Pryor?

22        A.    Marcus is a businessman.

23   Community ambassador here in town.  He is

24   one of the first people I met here in

25   Albany.

```
 1                    KILLINGS
 2        Q.    And what information did he
 3   share with you in the few days prior about
 4   what was going to happen?
 5        A.    He shared with me that I could
 6   not really know much but I want to show
 7   support for you with different people there
 8   in town.
 9        Q.    Did you ask him to do something
10   like that?  Put on a rally?  Or was that
11   his idea?
12        A.    I did not.
13        Q.    Was he, to your knowledge, the
14   one who organized the rally?
15        A.    I assume it was because it was
16   at a social club that he is a member at, so
17   I assume, but I don't know.
18        Q.    Were you involved in any
19   capacity in any preparation for that March
20   31st rally?
21        A.    Nothing whatsoever.
22        Q.    Did you talk to anyone
23   beforehand about what would be discussed at
24   the rally?
25        A.    No.
```

```
 1                    KILLINGS
 2      Q.    To your understanding what was
 3  the objective of the rally?
 4      A.    It was for support.  He used
 5  the word support, so I guess it was to show
 6  support of me and my family.  To give
 7  strength, I guess.
 8      Q.    Do you know how many people
 9  attended?
10      A.    I do not.
11      Q.    You did not attend?
12      A.    I did not.
13      Q.    Do you know who spoke at the
14  rally?
15      A.    Marcus, Innovo, a local
16  restaurant owner.  Alice Green, whom has
17  since deceased.  Kathleen McLean and I
18  believe Jamil Hood.  There could have been
19  others, but I know.
20      Q.    Of the people you just listed,
21  were you familiar with anyone of them other
22  Marcus Pryor before the rally?
23      A.    Kathleen I met when I first got
24  to town here.  I can't say to you she was a
25  close friend, but we see each other we were
```